## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **STANFORD DRESNIN, DDS, on behalf of himself and all others similarly situated,** | |
| **Plaintiff,** | **Civil Action No.** |
| **v.** | **CLASS ACTION COMPLAINT** |
| **PATTERSON COMPANIES, INC, HENRY SCHEIN, INC., and BENCO DENTAL SUPPLY COMPANY,** | **JURY TRIAL DEMANDED** |
| **Defendants.** | |

## CLASS ACTION COMPLAINT

Plaintiff Stanford Dresnin, DDS ("Plaintiff"), on behalf of himself and all other similarly-situated entities who have purchased dental supplies directly from one of more of the above-named Defendants, brings this action for treble compensatory damages and injunctive relief under the antitrust laws of the United States, against the Defendants, demanding a trial by jury on those issues so triable.  For his Complaint against Defendants, Plaintiff alleges the following based upon personal knowledge as to matters relating to himself, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Defendants are the three dominant dental product distributors in the United States. This case involves an anticompetitive conspiracy by these Defendants to foreclose competition by illegally engaging in a conspiracy to boycott competitor dental product distributors and other entities that do business with such competitors, in order to allow Defendants to maintain and extend their dominant collective market power in the market for the distribution of dental supplies and dental equipment (collectively, "dental supplies") in the United States.  As alleged in a complaint filed by the Texas Attorney General's Office against one of the Defendants,

"Benco and its competitor distributors engaged in ongoing communications over several months about [a new low-cost distributor].  They shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response. . . .  Benco and its competitor distributors contacted other distributors and manufacturers to pressure those entities to discontinue any relationships that ultimately supplied [the new low-cost distributor].  As a result of this pressure, other distributors and manufacturers discontinued such relationships, causing [the new low-cost distributor] to lose access to products."  This conspiracy allowed Defendants to injure Plaintiff and other members of the Class (defined below) by charging them prices substantially above competitive levels for dental supplies.

2.     Defendants Henry Schein, Inc. ("Henry Schein"), Patterson Companies, Inc. ("Patterson"), and Benco Dental Supply Company ("Benco") are the three largest distributors of dental supplies in the United States.  This market is highly concentrated.  It is also protected by high barriers to entry, due in large measure to Defendants' anticompetitive conduct alleged herein.  Together, Defendants make over 80 percent of all sales in the market.

3.     Plaintiff, like the members of the Class he seeks to represent, purchases dental supplies directly from Defendants.  There are thousands of similarly situated direct purchasers of dental supplies paying artificially inflated prices due to Defendants' unlawful anticompetitive conduct.  The Class includes over 135,000 dental and orthodontic practices ("dental practices") in the United States.  Most dental practices are small offices employing a single dental practitioner and his or her staff; the remaining dental practices are owned and/or operated by one dentist or a group of dentists.  The Class also includes separate dental laboratories ("laboratories"), which purchase a substantial amount of dental supplies directly from

Defendants.   There are approximately 7,000 laboratories in the United States.   All Class members paid artificially inflated prices due to Defendants' unlawful anticompetitive conduct.

4.      As further detailed below, Defendants unlawfully abused their collective market power by, *inter alia*, foreclosing competition through a concerted effort to exclude and/or impair competitors and potential competitors, engaging in a group boycott of competitors, and engaging in a group boycott of entities that did business or planned to do business with competitors.

5.      As a result of the anticompetitive scheme alleged herein, Defendants succeeded in increasing barriers to the entry and expansion of rival dental supplies distribution entities, thereby maintaining and enhancing market power, and charging artificially inflated prices to Plaintiff and other members of the Class.

6.      The anticompetitive practices of Defendants described herein gave rise to a private antitrust action by a would-be competitor, SourceOne Dental, Inc. ("SourceOne"). SourceOne would have become a powerful and market-destabilizing competitor absent the anticompetitive conduct alleged herein.   The SourceOne action is pending in this District, *SourceOne Dental, Inc. v. Patterson Companies, Inc., et al.*, No. 15-cv-5440 (E.D.N.Y. Sept. 21, 2015) (Azrack, J.).   SourceOne alleges, *inter alia*, that some of the conduct alleged herein has foreclosed and impaired its ability to compete effectively in the market for dental supplies distribution, and as a direct result, Defendants have avoided the need to reduce prices to compete on the merits with, and avoid losing market share to, SourceOne.

7.      Additionally, a Texas Attorney General investigation of some of the conduct at issue here resulted in a consent judgment against Defendant Benco in April 2015.   The consent judgment requires Benco to cooperate in the Texas Attorney General's ongoing investigation of

Defendants Henry Schein and Patterson for their alleged participation in a conspiracy to foreclose competition in the dental supplies distribution market in the United States.

8.     The Arizona Attorney General and the Federal Trade Commission ("FTC") have also each separately launched ongoing investigations into Defendants' conduct.

9.     The private complaints and government investigations have not curtailed Defendants' anticompetitive conduct.  Moreover, Defendants continue to charge Plaintiff and other Class members prices for dental supplies above competitive levels.

10.    The anticompetitive conduct alleged herein constitutes an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Defendants' conduct has had the purpose and effect of allowing Defendants to maintain and enhance their collective market power and thereby to charge supracompetitive prices to Plaintiff and other members of the Class for dental supplies, and to otherwise cause harm to competition and consumers more generally.

## JURISDICTION AND VENUE

11.    The claims set forth in this Complaint arise under Section 1 of the Sherman Act (15 U.S.C. § 1), and Plaintiff seeks treble damages pursuant to Section 4 of the Clayton Act (15 U.S.C. § 15(a)).  In addition, Plaintiff seeks injunctive relief pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26).  This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1337(a).

12.    Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 because (a) Defendants reside, transact business, committed an illegal or tortious act, have an agent, and/or are found in this District, and (b) a substantial portion of the events described below have been carried out in this District.

13.     This Court has personal jurisdiction over each Defendant because each Defendant transacts business and is subject to personal jurisdiction within the Eastern District of New York. Each Defendant sells dental supplies to dental practices and laboratories located in the Eastern District of New York.

14.     At all material times, Defendants sold their products to dental practices and laboratories located nationwide, operating in a continuous and uninterrupted flow of commerce across state lines. Defendants' conduct alleged herein has substantially affected interstate commerce.

## PARTIES

### PLAINTIFF

15.     Plaintiff Stanford Dresnin, DDS has a private dental practice in Philadelphia, Pennsylvania.   During the Class Period defined below, Plaintiff directly purchased dental supplies from one or more Defendants and was injured by paying inflated prices for dental supplies due to the illegal conduct described herein.

### DEFENDANTS

16.     Defendant Henry Schein, Inc. ("Henry Schein") is the largest distributor of dental supplies in the United States.  Henry Schein is incorporated in Delaware and has its principal place of business in Melville, Long Island, New York.  Henry Schein sells dental supplies to dental practices and laboratories nationwide, including dental practices and laboratories in the Eastern District of New York.

17.     Defendant Patterson Companies, Inc. ("Patterson") is the second largest distributor of dental supplies in the United States, incorporated in Minnesota, with its principal place of business in St. Paul, Minnesota.  Patterson sells dental supplies to dental practices and

laboratories nationwide, including dental practices and laboratories in the Eastern District of New York.

18.     Benco Dental Supply Co. Inc. ("Benco") is the third largest distributor of dental supplies in the United States.  Benco is incorporated in Delaware, with its principal place of business in Pittston, Pennsylvania.  Benco sells dental supplies to dental practices and laboratories nationwide, including dental practices and laboratories in the Eastern District of New York

## CLASS ALLEGATIONS

19.     Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of itself and the following class (the "Class"):

> All persons in the United States that directly purchased dental supplies and/or dental equipment from Henry Schein, Inc., Patterson Companies, Inc., and/or Benco Dental Supply Company at any time during the period from January 20, 2012 until the conduct challenged in this Complaint ceases ("Class Period"). Defendants Henry Schein, Inc., Patterson Companies, Inc., and/or Benco Dental Supply Company and their subsidiaries are not included in the Class.  Also excluded from the Class are federal and state entities that directly purchased dental supplies and/or dental equipment from one or more of the Defendants.

20.     Members of the Class are so numerous that joinder is impracticable.  The Class includes thousands of private dental practices and laboratories.

21.     There are numerous questions of law and fact common to the Class, including, without limitation:

a.     the extent to which Defendants collectively possess market power in the market for distribution of dental supplies in the United States;

b.     whether, through the conduct alleged herein, Defendants maintained and/or enhanced their collective market power;

c.      whether Defendants conspired to engage in unlawful exclusionary conduct to impair the opportunities of rivals in the market for distribution of dental supplies in the United States;

d.      whether Defendants agreed to illegally boycott one or more competitors;

e.      whether Defendants did in fact illegally boycott one or more competitors;

f.      whether Defendants agreed to illegally boycott and/or threaten to boycott state dental associations that did business or planned to do business with competitors;

g.      whether Defendants did in fact illegally boycott and/or threaten to boycott state dental associations that did business or planned to do business with competitors;

h.      whether Defendants agreed to illegally boycott and/or threaten to boycott manufacturers of dental supplies as a means to deter manufacturers from doing business with rival distributors of dental supplies;

i.      whether Defendants did in fact illegally boycott and/or threaten to boycott manufacturers of dental supplies;

j.      whether Defendants entered into exclusionary agreements that unreasonably restrained trade and impaired competition;

k.      whether Defendants' conduct as alleged herein constitutes a per se illegal violation of the antitrust laws;

l.      whether, and to what extent, Defendants' conduct caused direct purchasers to pay supracompetitive prices or fees and, thereby, to suffer antitrust injuries.

These and other common questions of law and fact predominate over any questions affecting only individual Class members.

22.     Plaintiff's claims are typical of the claims of the Class because all Class members suffered antitrust injuries in the same way as a result of Defendants' wrongdoing, and the claims of each Class member arise out of the same essential facts and are based on the same legal theories.

23.     Plaintiff will fairly and adequately represent and protect the interests of the Class.

24.     Plaintiff has retained counsel experienced in class action antitrust litigation, and Plaintiff has no interest in this litigation that conflicts with the interests of the other members of the Class.

25.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty for the Court in managing the claims of the Class that would preclude class certification.

## OVERVIEW OF THE DENTAL SUPPLIES INDUSTRY

26.     Dental supplies, such as sterilization products, x-ray film, acrylics, alloys, waxes, and impression materials, are routinely purchased by dental practices and laboratories and consumed in their daily operations. Dental practices and laboratories also regularly purchase specialty dental equipment, such as imaging devices, dental chairs, and high-tech equipment such as dental CAD/CAM systems. These businesses require a wide variety of dental supplies in their day-to-day operations. There are over 135,000 dental practices and approximately 7,000 laboratories in the United States. On average, dental practices spend 6 percent of their annual income on dental supplies.

27.     A significant majority of dental supplies are sold by manufacturers to intermediate distributors such as Defendants, who then resell those products to dental practices

and laboratories.  Because dental practices and laboratories require many different supplies from many different manufacturers, they generally opt to purchase dental supplies from distributors that offer a wide range of products from many different manufacturers, instead of placing individual orders from dozens of different manufacturers.   Dental supplies distributors, such as Defendants, carry comprehensive ranges of products from different manufacturers that allow customers to "one-stop shop" for dental supplies.  Distributors charge for that service.

28.     This relatively high price traditionally charged by Defendants for their services has left economic space for additional distributors to enter the market by being more efficient, earning lower margins, or both.  Such new distributors can both pay manufacturers *more* than Defendants are paying and charge purchasers like Plaintiff *less*, all while still making a profit. New entrants have the opportunity to become lower-cost distributors for manufacturers and lower-cost suppliers for dental practices and laboratories.

29.     However, because of Defendants' anticompetitive conduct as described herein, the market for the distribution of dental supplies remains highly concentrated, with significant barriers to entry caused by Defendants' anticompetitive conduct.  Together, Defendants make up over 80 percent of all sales in the market for distribution of dental supplies in the United States.

30.     In order for an entity to enter the distributor market and successfully sell dental supplies to dental practices and laboratories in the U.S., several key elements are required. The distributor must be able to offer a wide range of products from the more than 300 dental supplies manufacturers that make such products. The distributor must be able to purchase dental supplies in large enough volumes and at low enough prices to compete with competitor distributors. Finally, the entity must be able to market itself and offer dental supplies to large numbers of dental practices.  To achieve success, and be able to buy and stock the large quantity of supplies

necessary to achieve economies of scale that allow for lower prices, new distributors must be able to reach large numbers of dental practices, laboratories, and dental supplies manufacturers efficiently.

31.     State dental associations—voluntary associations of dentists—possess an important ability to connect a new distributor with dental practitioners statewide by endorsing and/or partnering with the distributor.  State dental associations are not in the business of purchasing and selling dental supplies, but they can help to facilitate the entry of new distributors by partnering with new distributors and endorsing the distribution platform for their members. In this way, state dental associations serve an important gatekeeper function in validating new entrants.  However, state dental associations are also a convenient "choke point" that Defendants can and have pressured through group boycotts to block the entry of less expensive new distributors.

32.     Lower-cost distributors have for years attempted to enter the market, and many state dental associations have been actively interested in sponsoring, and partnering with, new distribution platforms as a benefit to their members.  However, new distributors have largely been unsuccessful in partnering with or securing the endorsement of state dental associations because of Defendants' unlawful coordinated boycotts alleged herein.  Defendants have refused to do business with any new competitor in the dental supplies market, and have frustrated other entities' attempts to do business with actual and potential rival distributors.  Any successful entry of a new competitor into the dental supplies distribution market, and the resulting price discounts that would result from increased competition, would substantially threaten Defendants' collective market share, revenues and profits.  As further detailed below, Defendants responded

to the threat of new competitors by conspiring to boycott and threaten entities in order to prevent the successful entry of new competitors into the dental supplies distribution market.

33.     Defendants' dominant collective market power has allowed them to foreclose the market to rival competition, thereby impairing competition, maintaining and enhancing market power, and charging inflated prices above competitive levels to Plaintiff and the Class.

## DEFENDANTS EXERCISE MARKET POWER

34.     Defendants' anticompetitive conduct and agreements constitute a horizontal group boycott that is a *per se* violation of Section 1 of the Sherman Act.  Thus, Plaintiff need not define a relevant market.

35.     Alternatively, if the Court determines that Plaintiff's Sherman Act claim cannot proceed under a theory of *per se* group boycott, Defendants' anticompetitive conduct and agreements constitute a violation of the Sherman Act under the "rule of reason."  In this case, the relevant market, limited geographically to the United States, is the market for distributing and selling a wide range of dental supplies, including offering direct purchasers the convenience of purchasing a variety of supplies from a single distributor.

36.     As detailed *passim*, many hundreds of manufacturers make dental supplies, but most of the over 135,000 dental practices are small companies that lack the ability to efficiently fulfill their dental supplies needs by purchasing through hundreds of different vendors.  Instead, dental practices and other direct purchasers use vendors, like the Defendants, who can fulfill most or all of their needs for dental supplies.

37.     For direct purchasers, there are no reasonably available substitutes for distributors of a wide range of dental supplies.  Even if individual manufactures sell supplies directly, they

do not carry a wide range of supplies and it is not economically efficient for dental practices and laboratories to maintain relationships with hundreds of different vendors.

38.    At all relevant times Defendants possessed market power—the ability to profitably raise prices significantly above competitive levels while not losing sales—as evidenced by Defendants' abnormally high profit margins in what should, if it were competitive, be a tight, low profit margin, distribution market.

39.    A small but significant non-transitory increase in price by Defendants would not have caused them to lose a significant amount of sales.

40.    Suppliers of one or a limited range of dental supplies do not meaningfully discipline Defendants' pricing power, and products sold by limited suppliers do not exhibit significant positive cross-price elasticity of demand with respect to products sold by Defendants.

41.    Defendants sell dental supplies at prices well in excess of marginal costs and the competitive price and therefore have enjoyed artificially high profit margins, especially when compared with distributors of other types of medical products, like prescription pharmaceuticals.

42.    An alternative relevant market, limited geographically to the United States, is the market for the distribution and sale of dental supplies.

43.    Defendants collectively have substantial market power in all relevant markets.

44.    Defendants abused their dominant collective market power by privately communicating and reaching an agreement to engage in an anticompetitive scheme to foreclose and impair competition, maintain and enhance market power, and artificially inflate prices of dental supplies above competitive levels.

## DEFENDANTS' ONGOING ANTICOMPETITIVE CONDUCT

45.    In 2013, a new distributor—SourceOne—created a dental supplies distribution platform in partnership with the Texas Dental Association ("TDA"), planning to offer many of the same products offered by Defendants, at lower prices.  The online sales platform, called "TDA Perks Supplies," allowed members of the TDA to purchase dental supplies from many different manufacturers.

46.    SourceOne reached an agreement with several manufacturers to offer dental supplies to TDA members at prices that were substantially less than Defendants' prices for similar products.  The endorsement of the TDA allowed the new distributor to secure contracts with a significant number of dental supplies manufacturers, which in turn enabled it to offer dental practices the "one-stop shopping" convenience that was previously only offered by distributors such as Defendants.

47.    Encouraged by the initial success of the TDA website, SourceOne and other competitors planned to partner with other state dental associations and national organizations to develop similar distribution platforms.  The nationwide expansion of online distribution platforms would have significantly increased competition in the distribution market, resulting in lower prices for dental supplies across-the-board.

48.    Even though they were direct competitors, Defendants nonetheless engaged in regular communications with each other as a means to reach an agreement on a collective response to the threat posed by SourceOne and other new competitors.  For instance, Defendants frequently communicated with each other at in-person meetings, via electronic mail and texts, and through phone calls.  Many of Defendants' employees previously worked at another Defendant company.  These overlapping business and personal relationships facilitated the sharing of sensitive competitive information and furthered Defendants' unlawful collusion.

49.     In response to the threat of new competitors entering the market, Defendants reached an agreement with one another to thwart the success of new competitors through unlawful threats and boycotts of competitors, such as SourceOne, and entities that dealt with competitors.  Defendants' conspiracy included the following elements, among others:

## A.     Defendants Agreed to Pressure Manufacturers to Refrain From Doing Business With Competitors

50.     Many dental supplies manufacturers make substantial portions of their total sales through Defendants.  These manufacturers substantially rely on Defendants to market and resell their products to dental practices and laboratories.  If Defendants were to stop selling products from one of these manufacturers, or if Defendants were to reduce their efforts to sell a manufacturer's products, that manufacturer would suffer significant financial losses.

51.     Defendants conspired to collectively pressure and threaten manufacturers and other distributors to discontinue and refrain from supplying new lower-priced distributors with dental supplies.  In furtherance of this conspiracy, Defendants threatened that if manufacturers did business with new lower-priced distributors, Defendants would not sell or would not actively promote the manufacturers' products.

52.     Because Defendants collectively hold a dominant share of the dental supplies distribution market, and because many manufacturers are beholden to Defendants, these threats were successful in coercing many manufacturers to cease doing business with SourceOne and other new distributors.

53.     Notably, manufacturers that did not rely on Defendants for a substantial portion of their revenues generally did *not* cease to do business with SourceOne and other competitors. These manufacturers were not as impacted by Defendants' boycotts and threats because their profitability was not dependent on sales to Defendants.  Only the manufacturers that regularly

sold numerous products to Defendants—those manufacturers, therefore, that would have been harmed if Defendants followed through on their threats—agreed to participate in the boycotts and refrain from dealing with new and competing distributors.

54.    In a competitive market, a single distributor's boycott of a dental supplies manufacturer would contravene that distributor's unilateral self-interest.  A customer wishing to purchase products from the boycotted manufacturer would simply purchase the products through a competing distributor.  That competing distributor would, in turn, gain market share and profits at the expense of the distributor unilaterally conducting the manufacturer boycott.  Accordingly, a manufacturer boycott of the type alleged here would only occur, and only makes economic sense, if those entities engaging in the manufacturer boycott were doing so collectively, and by agreement.  Had Defendants not been acting as a part of a conspiracy, it would have made no economic sense for any one individual Defendant to boycott dental supplies manufacturers.

**B.      Defendants Agreed to Pressure State Dental Associations to Refrain From Doing Business With Competitors, and to Boycott State Dental Associations That Endorsed, or Partnered With, Competitors**

55.    Dental supplies distributors, including Defendants, regularly send sales representatives to attend and participate in state dental association annual meetings and trade shows.  State dental associations depend on the attendance of dental supplies distributors at their annual expos—especially major distributors like Defendants—because revenues from these shows account for a substantial portion of the dental associations' annual incomes.

56.    Defendants conspired to boycott the annual trade shows and meetings of state dental associations that were doing business with SourceOne, and to threaten to boycott state dental associations that were considering doing business with SourceOne and other competitors.

As part of the conspiracy alleged herein, Defendants also pressured dental supplies manufacturers and other distributors to join these boycotts.

57.     In furtherance of this conspiracy, Defendants threatened to boycott the annual meetings and trade shows of the TDA, the Arizona Dental Association ("AZDA"); and the Louisiana Dental Association ("LDA").  Defendants not only threatened, but actually did boycott the annual meetings and trade shows of the TDA and the AZDA.  The LDA had previously planned to endorse SourceOne's online platform, but in the face of Defendants' threatened boycotts, the LDA reversed itself, and abandoned those plans.

58.     With knowledge of the examples of Defendants' successful boycotts of the TDA and AZDA, other state dental associations were deterred from partnering with new distributors.

59.     Defendants' boycotts of state dental associations that did business with new, disruptive distributors were highly effective.  State dental associations, including the LDA, abandoned plans to endorse or partner with competitors and were deterred from doing business with those new competitors.

60.     In a competitive market, a single distributor's unilateral boycott of a state dental association annual meeting or trade show would contravene that distributor's self-interest. Sending sales representatives to trade shows allows a distributor to promote its brand and market its services to thousands of state dental association members.  In many cases, distributors that withdrew from trade shows to boycott a dental association lost significant security deposits. Thus, had Defendants not been acting as a part of a conspiracy, it would have made no economic sense for any individual Defendant to have unilaterally boycotted state dental association trade shows.

### C.     Defendants' Anticompetitive Conduct Has Been Ongoing For Years

61.     Defendants have engaged in other collective anticompetitive conduct against distributors of dental supplies for many years.

62.     For example, in 2012, Archer and White Sales, Inc., ("Archer"), a lower-priced distributor of dental supplies, filed an antitrust case claiming that certain Defendants engaged in anticompetitive conduct including:

- Conspiring to thwart Archer's growth in certain parts of the country;

- Engaging in a price-fixing conspiracy by agreeing not to competitively bid against horizontal competitors;

- Obstructing Archer's membership in the American Dental Cooperative, an organization created to help smaller companies compete against large national dental supplies distributors; and

- Coordinating boycotts against Archer by threatening to stop buying equipment from certain suppliers and to stop selling equipment from certain manufacturers.

## THE MARKET FOR DISTRIBUTION OF DENTAL SUPPLIES IN THE UNITED STATES IS HIGHLY SUCCEPTABLE TO ANTICOMPETITIVE CONSPIRACY

63.     The market for the distribution of dental supplies exhibits a number of characteristics that increase its susceptibility to anticompetitive conspiracy among distributors. These factors—including high concentration among firms in the market, barriers to entry caused by Defendants' anticompetitive conduct, stable or constant demand, and a record of antitrust inquiry—indicate the potential for successful collusion among dental supplies distributors.

### A.     The Market Is Highly Concentrated

64.     Defendants' combined market share has steadily increased over the past five years.  Together, Defendants comprise well over 80 percent of the dental supplies distribution market.

65.     While Defendants market and distribute dental supplies nationwide, most other distributors are regional and local companies that serve specific areas.  Due to the conduct

alleged herein, competitors have been unable to establish a solid nationwide presence that could put pressure on Defendants to reduce prices.

66.     The Herfindahl-Hirschman Index ("HHI") is a measure of industry concentration that economists often use to quantify the degree of market concentration.  The U.S. Department of Justice considers an HHI value higher than 2,500 to be a "highly concentrated" industry.  In the market for dental supplies, the HHI is above 3,000.

67.     A concentrated market makes it easier for distributors to coordinate behavior and makes it more difficult for direct purchasers to avoid the adverse effects of collusive behavior.

### B.     The Market Has High Barriers to Entry

68.     High barriers to entry caused by Defendants' anticompetitive conduct increase the likelihood that distributors can successfully conspire to further increase barriers to entry, thereby restricting the ability of new low-cost dental supplies providers to enter the market.

69.     The market has certain chokepoints, such as prominence and importance of state dental associations to the success of new distributors, and the market power of the Defendants over the manufacturers that make manufacturers particularly reliant upon the Defendants, collectively, that make it susceptible to a Defendant-driven group boycott.

70.     These barriers to entry increase the market's susceptibility to a coordinated effort among the largest suppliers in the industry to maintain supracompetitive prices.

### C.     Aggregate Demand is Relatively Constant

71.     In a competitive market, firms faced with static or declining demand conditions will attempt to increase sales by decreasing prices to take market share from competitors.  For this reason, firms faced with static or declining demand have a greater incentive to collude to

avoid price competition.  Rising or stagnant prices and high profit margins with constant or declining demand are inconsistent with a competitive market.

72.     While aggregate demand among purchasers of dental supplies has been relatively constant over the past eight years, Defendants have consistently increased their prices during that time.

73.     An estimated 75 percent of all sales are made through dental supplies distributors, and single-dentist dental practices account for the bulk of purchases.  Because most dental practices and laboratories cannot expend the resources necessary to coordinate the purchasing of all of their required dental supplies directly from hundreds of different manufacturers, distributors like Defendants can resell products and equipment at significant profit margins.

74.     Because demand for dental supplies is a function of the demand for dental services, and many privately insured adults and children receive routine dental care coverage, demand for dental supplies among dental practices is especially consistent.

75.     Defendants Henry Schein and Patterson have increased list prices for dental supplies every year since 2005.  As illustrated in Figure 1 below, these distributors' list prices increased even when the economic recession of 2009 caused demand for dental supplies to fall by over 2 percent.

**Figure 1: Changes in Dental Supplies Demand versus Distributor List Prices**



■ Dental Supplies Demand   ■ Henry Schein Prices   ■ Patterson Prices

76.      Defendants are highly profitable, with profit margins ranging as high as 11 percent (for Patterson in 2010 and 2011). Profit margins among distributors in related health care product markets are significantly lower. For example, profit margins for the "big three" distributors of pharmaceuticals in the U.S. (McKesson, Cardinal Health, and AmerisourceBergen) typically hover between 0.2 and 1.5 percent. The most recent public data for the "big three" shows quarterly profit margins between 1.03 and 1.37 percent.

77.      Rising prices in the face of declining demand is consistent with an industry in which sellers are conspiring to exert market power. The dental supplies distribution industry has experienced consistently increasing list prices while demand has either declined or stagnated.

## PRIOR INVESTIGATIONS OF AND ACTIONS AGAINST DEFENDANTS

78.      In 2014, the Texas Attorney General initiated an investigation of Defendants for anticompetitive conduct in violation of Texas antitrust statutes.   On April 9. 2015, the Texas Attorney General filed a complaint against Defendant Benco.  The complaint alleged that Benco conspired with other distributors to boycott the 2014 TDA annual meeting because the TDA had partnered with SourceOne, and that Benco and other distributors pressured distributors and manufacturers to discontinue doing business with SourceOne.

79.      The allegations in the Texas Attorney General complaint comprise some of the same anticompetitive conduct alleged here.   Allegations levied in the Texas AG complaint include, *inter alia*:

- "Benco and its competitor distributors engaged in ongoing communications over several months about [a new low-cost distributor].  They shared information about market players' reactions to the new firm's entry, they collectively developed a response, and they provided reassurances to market participants about the collective response."

- "Benco and its competitor distributors (1) agreed to break with their traditional pattern and boycott the annual TDA meeting held in May 2014 because they perceived that [a new low-cost distributor] had positioned itself as a competitor to the traditional distributors, and (2) agreed to pressure other distributors and manufacturers to discontinue supplying [the new low-cost distributor] and/or end any relationships with manufacturers or distributors that ultimately supplied [the new low-cost distributor] in order to stifle the competition provided by the new TDA offering."

- "Benco and its competitor distributors did not attend the annual TDA meeting, despite the economic gains Benco and other distributors historically derived from the event."

- "Benco and its competitor distributors contacted other distributors and manufacturers to pressure those entities to discontinue any relationships that ultimately supplied [the new low-cost distributor].   As a result of this pressure, other distributors and manufacturers discontinued such relationships, causing [the new low-cost distributor] to lose access to products."

80.     On the same day the complaint was filed, the Texas Attorney General and Benco agreed to a consent judgment.  The consent judgment required Benco to reimburse the Texas Attorney General $300,000 for costs and fees, and requires Benco to cooperate in the Texas Attorney General's ongoing investigation of other distributors.

81.     In 2014, the Arizona Attorney General initiated an investigation of Benco and other yet-unknown dental supplies distributors for anticompetitive conduct in violation of Arizona law.  In October 2014, the Arizona Attorney General issued Civil Investigative Demands ("CIDs") requiring Benco to produce documents and electronic materials relating to the investigation, and Benco produced documents in response to the CIDs.  That investigation is ongoing.

82.     After the Texas and Arizona Attorneys General launched investigations, the FTC opened an investigation of Benco and other unnamed dental supplies distributors.  That investigation is ongoing.

83.     A private antitrust action by Archer against certain Defendants was filed in the U.S. District Court for the Eastern District of Texas in August of 2012.  That case is proceeding in arbitration.

84.     A separate private antitrust action by SourceOne against Defendants is pending in this District, *SourceOne Dental, Inc. v. Patterson Companies, Inc. et al.*, No. 15-cv-5440 (E.D.N.Y. Sept. 21, 2015) (Azrack, J.).

85.     These government investigations and private enforcement actions have not deterred Defendants from continuing the anticompetitive conduct alleged herein, nor have they remedied the effects of Defendants' anticompetitive conduct.

## HARM TO COMPETITION DUE TO THE CONSPIRACY

86.    The anticompetitive conduct described in this Complaint maintained and increased Defendants' collective market power, enabling Defendants to maintain prices above competitive levels, to the detriment of Plaintiff and other members of the Class.  This harm to the Plaintiff and other Class members, in the form of paying artificially inflated prices for dental supplies, constitutes cognizable antitrust injury and harm to competition under the antitrust laws. To the extent relevant, the anticompetitive actions alleged in this Complaint had other competitive harms as well.  As a result of the successful boycotts of new entrants, other potential competitors were discouraged from partnering with manufacturers and/or state dental associations to  compete with Defendants.

87.    Other than the artificially inflated prices charged to Plaintiff and other Class members, the anticompetitive effects of the conspiracy alleged herein include, *inter alia*: reduced competition in the dental supplies distribution market, reduced consumer choice, and harm to consumer welfare generally.

88.    There are no legitimate procompetitive justifications for the anticompetitive conduct alleged in this Complaint, or for any aspect of Defendants' conspiracy standing alone, and even if there were, there are less restrictive means of achieving those purported procompetitive effects.  To the extent that Defendants' anticompetitive conduct or any aspect of their conspiracy has any cognizable procompetitive effects, they are substantially outweighed by the anticompetitive effects.

## ANTITRUST INJURY TO PLAINTIFF AND MEMBERS OF THE CLASS

89.    During the Class Period, Plaintiff and members of the Class purchased dental supplies from Defendants.  As a result of Defendants' anticompetitive conduct alleged herein,

members of the Class paid Defendants prices for dental supplies that were inflated above competitive levels during and throughout the Class Period.

90.     If new low-cost distributors had not been unlawfully prevented from partnering with state dental associations and dental supplies manufacturers, they would have emerged as major competitors to Defendants, resulting in greater competition and substantially lower prices for dental supplies, and Plaintiff and the members of the Class would have paid substantially less for dental supplies during and throughout the Class Period.

91.     If Defendants had not unlawfully conspired to prevent new low-cost distributors from partnering with state dental associations and dental supplies manufacturers, other competitors would have partnered with state dental associations and manufacturers and emerged as viable nationwide competitors to Defendants, resulting in increased competition and substantially lower prices for dental supplies, and Plaintiff and the members of the Class would have paid substantially less for dental supplies as a result during and throughout the Class Period.

92.     Because Defendants were successful in unlawfully preventing new low-cost distributors and other competitors from partnering with state dental associations and dental supplies manufacturers to compete with Defendants, competition in the market was substantially harmed, and Plaintiff and members of the Class have sustained, and continue to sustain, substantial losses in the form of artificially inflated prices paid to Defendants. The full amount of such damages will be calculated after discovery and upon proof at trial.

93.     Injury to Plaintiff and members of the Class was a direct and foreseeable result of Defendants' anticompetitive conduct. Defendants' group boycotts foreclosed new entrant competitors, thereby suppressing competition, enhancing market power, and allowing Defendants to charge artificially inflated prices to dental practices and laboratories for dental

supplies.  Although the mechanism of antitrust injury to Plaintiff and to competitors is the same, the damages caused to Plaintiff and other members of the Class in the form of artificially inflated higher prices is distinct from, and not duplicative of, the damages caused to competitors in the form of lost profits and business opportunities.

94.     Defendants' anticompetitive conduct is continuing, and so are the overcharges suffered by Plaintiff and the Class caused by Defendants' conduct.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1:
### Unlawful Agreements in Unreasonable Restraint of Trade

95.     Plaintiff incorporates by reference the preceding allegations.

96.     As set forth above, in violation of § 1 of the Sherman Act, Defendants entered into agreements with one another to boycott and threaten to boycott state dental associations, dental supplies distributors, and dental supplies manufacturers that were doing business or considering doing business with new low-cost distributors and other competitors.  This conspiracy was a *per se* unlawful group boycott, or in the alternative, was un unlawful restraint under the rule of reason.

97.     Each Defendant has committed at least one overt act—such as boycotting entities that did business with new low-cost distributors—to further the conspiracy alleged herein.

98.     Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations.  The injury to Plaintiff and the Class consists of paying prices for dental supplies inflated above competitive levels.  Such injury, in the form of overcharges, is of the type that antitrust laws were designed to prevent, and flows directly from Defendants' unlawful conduct.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following:

A.      Certification of the Class proposed in this Complaint;

B.      Judgment in favor of itself and the Class it seeks to represent and against Defendants, and damages, measured as the overcharges that Plaintiff and the other members of the Class paid as a result of Defendants' anticompetitive conduct, trebled;

C.      Pre- and post-judgment interest;

D.      Injunctive relief to prevent further anticompetitive conduct; and

E.      Costs of suit, including reasonable attorneys' fees.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: February 1, 2016

_____

Marc H. Edelson, Esq.
**EDELSON & ASSOCIATES, LLC**
3 Terry Drive, Suite 205
Newtown, PA 18940
Tel: (215) 867-2200
Fax: (267) 685-0676
medelson@edelson-law.com

*Counsel for Plaintiff and the Proposed Class*